UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **REDACTED TRANSCRIPT** |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | CAUSE NO. 1:18-cr-00109-JMS-MJD |
| | ) | Indianapolis, Indiana |
| JEFFREY ESPOSITO (01), | ) | Tuesday, January 7, 2020 |
| | ) | 9:05 o'clock a.m. |
| Defendant. | ) | |

Before the
HONORABLE CHIEF JUDGE JANE MAGNUS-STINSON

TRANSCRIPT OF SENTENCING HEARING

APPEARANCES:
FOR THE GOVERNMENT:    United States Attorney's Office
By:  Steven D. DeBrota
10 West Market Street, Suite 2100
Indianapolis, Indiana 46204

U.S. Department of Justice
Child Exploitation & Obscenity Section
By:  Lauren Sara Kupersmith
1400 New York Avenue, N.W.
Washington, DC 20005

FOR THE DEFENDANT:     Indiana Federal Community Defenders
By:  William H. Dazey, Jr. and
Gwendolyn M. Beitz
111 Monument Circle, Suite 3200
Indianapolis, Indiana 46204

ALSO PRESENT:          The Defendant in person.

COURT REPORTER:        Jean A. Knepley, RDR, CRR, CRC, FCRR
46 East Ohio Street, Room 309
Indianapolis, Indiana 46204

PROCEEDINGS TAKEN BY MACHINE SHORTHAND
COMPUTER-AIDED TRANSCRIPTION

1              (In open court.)

2              THE COURT:  We are here under Cause No. 1:18–cr–109.

3    This is the case of the United States v. Jeffrey Esposito.

4    Mr. Esposito is present in person with counsel, Ms. Beitz and

5    Mr. Dazey.  The Government is present by Assistant United

6    States Attorneys Steve DeBrota and Lauren Kupersmith.  They

7    are assisted by Mike Johnson and John Pirics from Homeland

8    Security.

9              This matter is before the court for sentencing, and

10   Probation Officer Kristine Talley is present who prepared the

11   presentence report in this case.  Our court reporter is Jean

12   Knepley.

13             Back on June 4, 2019, Mr. Esposito pled guilty to all

14   counts charged in the indictment, Counts I through XXI, and

15   the Court accepted his plea at that time.  Before court today

16   the Court has reviewed the presentence investigation report

17   prepared by Ms. Talley, the objections to that report, the

18   sentencing memorandum prepared by the Government that is found

19   at Docket 52, the victim impact statements filed at Docket 51,

20   and the sentencing memorandum submitted on behalf of Mr.

21   Esposito by Defense Counsel, which is found at Docket 53.

22             Are there any other documents for the Court to consider

23   today, Ms. Beitz?

24             MS. BEITZ:  There are not, Your Honor.

25             THE COURT:  All right.

1      And are there any other documents from the Government's

2  perspective?

3           MS. KUPERSMITH:  No, Your Honor.

4           THE COURT:  Are there any victims to be heard today,

5  Ms. Kupersmith -- is it Kupersmith?

6           MS. KUPERSMITH:  Kupersmith.

7           THE COURT:  Kupersmith.  All right.  Are there any

8  victims to be heard today outside of what has been submitted

9  in writing?

10          MS. KUPERSMITH:  There are none present, Your Honor;

11  however, Minor Victim 1 did ask that his statement be read out

12  loud to the Court, which I was going to do.

13          THE COURT:  Ms. Beitz, let me ask you if you and Mr.

14  Esposito have read and discussed the presentence report.

15          MS. BEITZ:  We have, Your Honor.

16          THE COURT:  Is it accurate?

17          MS. BEITZ:  It is, Your Honor.

18          THE COURT:  There were some objections that were

19  made; however, they don't change the guideline calculation and

20  are really more in the way of clarification.  And are you

21  satisfied with probation's inclusion of them on the final page

22  of the PSR?

23          MS. BEITZ:  We are, Your Honor.

24          THE COURT:  Thank you.  Any other objections that

25  you would like to raise?

1          MS. BEITZ:  No, Your Honor.

2          THE COURT:  Any objections or corrections for the

3     Government?

4          MS. KUPERSMITH:  No, Your Honor.

5          THE COURT:  And with regard to the proposed

6     conditions of supervision that are contained within the

7     presentence investigation report at Paragraphs 272 and 273,

8     Ms. Beitz, are there any objections to those proposed

9     conditions?

10          MS. BEITZ:  There are none, Your Honor.

11          THE COURT:  Have you reviewed those with Mr.

12     Esposito?

13          MS. BEITZ:  Yes, Your Honor.

14          THE COURT:  Mr. Esposito, the probation officer has

15     included the conditions of supervision that she believes are

16     appropriate in your case.  They were found in Paragraphs 272

17     and 273 of the presentence investigation report.  Do you agree

18     with Ms. Beitz that you have reviewed these conditions?

19          THE DEFENDANT:  Yes, ma'am.

20          THE COURT:  I agree with probation as to the

21     propriety of those conditions and why she is recommending

22     them.  Do you understand them?

23          THE DEFENDANT:  Yes, ma'am.

24          THE COURT:  You have the right to have me read each

25     of these conditions out loud when I pronounce sentence later

1   this morning, or if you believe you understand them and why

2   they are being imposed, you can waive or give up that right.

3   Do you wish for me to read the conditions out loud when I

4   pronounce sentence?

5              THE DEFENDANT:  No, ma'am.

6              THE COURT:  All right, thank you.

7        The Court will accept that waiver and will also accept

8   the presentence report as its findings of fact and accept the

9   report for the record under seal.  In the event of any appeal,

10  Counsel will have access to the sealed report but not to the

11  recommendation portion, which shall remain confidential.

12  There was one thing I wanted to confirm.  Okay.  All right.

13       And the probation department has conducted a guideline

14  calculation.  It is a rather complex calculation, given the

15  number of counts in the case, but it begins on paragraph —— or

16  page 16.  With respect to —— let me just say this.  The Court

17  has reviewed the calculation, and based on the facts presented

18  in the offense conduct summary and that are known to the

19  Court, finds the calculation to be correct for each count and

20  in the aggregate.  Does either party have any objection to the

21  guideline calculation, Ms. Kupersmith?

22             MS. KUPERSMITH:  No, Your Honor.

23             THE COURT:  Ms. Beitz?

24             MS. BEITZ:  No, Your Honor.

25             THE COURT:  So the result of the guideline

1  calculation, ultimately, if contained in paragraph -- the

2  offense level result, after all of the various computations

3  per count, the adjustments under Chapters 3, 4, and 5 result

4  in a total offense level of 43.  That is found at Paragraph

5  231.

6      The Defendant has no prior criminal history, so he is in

7  criminal history category I, and the guidelines at the level

8  of 43-I would call for a sentence of life imprisonment.

9  However, that is not a sentence that is allowed for under the

10  statutory maximum for each of the counts.  Consequently, the

11  statutorily authorized maximum, running consecutive, becomes

12  the guideline sentence.  And that range, then, is 620 years or

13  7,440 months pursuant to Sentencing Guideline 5G1.2(b).

14      Is there any objection to that calculation, Ms.

15  Kupersmith?

16          MS. KUPERSMITH:  No, Your Honor.

17          THE COURT:  Ms. Beitz?

18          MS. BEITZ:  No, Your Honor.

19          THE COURT:  All right.  The Court will adopt that,

20  then, as its guideline calculation in the case incorporating,

21  by reference, each of the guideline calculations made by the

22  probation officer with respect to each of the counts in this

23  case.  Those would include all of the computations that begin

24  at Paragraph 48 and conclude with Paragraph 234 and then also

25  cross-referencing Paragraph 266 of the presentence

1    investigation report.

2         Could we address at this point the issue of restitution?

3    My understanding, Ms. Kupersmith, is that on behalf of Minor

4    Victim 1, there has been specified damages, special damages of

5    $730, for which documentation has been made, and the

6    Government has requested an additional $3,000 for that victim;

7    is that correct?

8              MS. KUPERSMITH:  Yes, Your Honor.  We understand

9    that Minor Victim 1 is in therapy and will be continuing to be

10   in therapy for a large portion of his life; however, we were

11   not able to ascertain an actual figure for that amount at this

12   time.  And so considering he is both a production victim and a

13   possession victim and paradigm sets, and appropriate costs for

14   possession victim at 3,000, we were asking for both the 3,000

15   and the 730, which is what has actually been spent to date

16   that we have documentation for.

17        But we would ask the opportunity to tell them if the

18   Court is going to allow that amount, that that is the amount

19   that has been set, and if they would like to request

20   additional for the future therapy costs, to give them an

21   opportunity to do so.

22             THE COURT:  Okay.  They have a certain period of

23   time, correct?

24             MS. KUPERSMITH:  I believe they have 90 days.

25             THE COURT:  Okay.  Is there any objection to either

1    the 3,600 -- sorry, the $3,730 or the ability of Minor

2    Victim 1 to request additional funding, Ms. Beitz?

3                MS. BEITZ:  No, Your Honor.

4                THE COURT:  With respect to Count XXI, the

5    possession — Count XXI, the possession count, there were a

6    number of victims identified in those, in the images that were

7    possessed, and the Government, my understanding, is requesting

8    for Pia and Mya, $3,000 each to be paid to Deborah Bianco in

9    trust for them.  For victim known as Jessy, $3,000, again,

10   paid to the same attorney in trust for Jessy.

11              For Jack, the same amount paid to the same person.  For

12   Kauzie, $3,000, same amount, same person in trust; and for

13   Maureen, $3,000, paid to the same person in trust for Maureen

14   at the same address.  Then there were five victims of what is

15   known as the 8 Kid Series.  The Government is asking for 3,000

16   each, for a total of $15,000 to be paid to Tanya Hankins in

17   trust for the 8 Kid Series.

18              Are there any objections on the part of the Defendant to

19   the restitution claimed for each of those victims and in those

20   amounts?

21              MS. BEITZ:  No, Your Honor.

22              THE COURT:  All right, thank you.  And then, is

23   there any issue the respect to forfeitures?

24              MS. KUPERSMITH:  We intend to forfeit all of the

25   child pornography and the equipment that is holding it.

1            THE COURT:  The Court would propose to reference

2    that as all property or other assets used in connection with

3    the offenses, including computers, computer storage media,

4    devices, phones, cameras, images, and videos seized from the

5    Defendant on or about March 13, 2018.  Any objection to that

6    characterization?

7            MS. KUPERSMITH:  No, Your Honor.

8            THE COURT:  Ms. Beitz?

9            MS. BEITZ:  No, Your Honor.

10           THE COURT:  All right, thank you.

11           MS. KUPERSMITH:  Your Honor, we do also have a

12   number of items that were seized from the residence in Ohio,

13   some of which belong to the victim and the victim's mother.

14   My understanding is that child pornography was not found on

15   those devices.  To the extent it, it fits your definition, we,

16   we would forfeit it.  And to the extent it doesn't, we would

17   return it back to the victim and the victim's mother.

18           THE COURT:  The Court is, obviously, only ordering

19   forfeiture with respect to the Defendant's interest in any of

20   this property; and so, to the extent the Government is going

21   to return it to individuals that aren't the Defendant, I think

22   that is beyond the scope of the Court's order.

23           MS. KUPERSMITH:  Thank you, Your Honor.

24           THE COURT:  All right, thank you.

25           And you had indicated that you wish to read a statement

1  on behalf of Minor Victim 1.

2           MS. KUPERSMITH:  Yes, Your Honor.

3           THE COURT:  Go ahead, please.

4           MS. KUPERSMITH:  Your Honor, this statement was

5  submitted in the packet, but Minor Victim 1 did ask that it be

6  read to the Court.  So I will do that with few exceptions of

7  redacting a few items that lead to his identification.

8           THE COURT:  All right.  Go ahead, please.

9           MS. KUPERSMITH:  To all those present today in

10 court, my name is, and I am 17 years old.  I am a high school

11 wrestler and high school student athlete --

12          THE COURT REPORTER:  I'm sorry, can you please slow

13 down when you are reading?

14          MS. KUPERSMITH:  Yes.

15          THE COURT REPORTER:  "High school student athlete."

16          MS. KUPERSMITH:  The Defendant's sexual abuse has

17 affected me in many ways mentally, physically, and

18 emotionally.  It has affected me the most mentally because

19 going through all of this, I couldn't truly find a way to

20 express myself and find who I know I am.

21     I was trapped in my own head from everything that

22 happened to me.  I felt very uneasy, and it made me feel that

23 home was just a nightmare.  I felt that I was unsafe and that

24 something was going to happen to me from any little thing I

25 did.  It also made me feel sad a majority of the time

throughout the years that it occurred.  I felt alone, anxious, afraid, and it made me not really want to be a part of anything or do anything.

It took away my pride and joy for just being alive.  It made me feel that I just wanted to be dead or asleep and not wake up.  When I was with the Defendant, I was very uncomfortable and afraid for my safety and what he would do to me.  In my everyday life, I have been affected.  I felt insecure around everyone and felt everything I did was wrong and that everyone was out to get me.

I felt unwanted and unloved.  There were even times at home with family that I always felt the need to be alone in my room, away from everyone else because if I was in the presence of the Defendant, I wanted to cry.  He took away the power that I had of just being myself.  He was always negative and really rude.

To my friends, they would probably think he was a great person, and they probably wished they could have someone like him.  But if they actually knew what happened and were in my shoes, I don't think they would have wanted him, like, I didn't want him either.

There were plenty of times throughout all of this that I tried to find escape just to get away from the pain.  I tried multiple times to commit suicide so I wouldn't have to deal with the pain anymore, and I would know that I was free and

not have to go through this pain.  I tried to hang myself
multiple times with a belt and some rope, and every time that
I tried to, I just wouldn't have enough courage, even though I
wanted to so bad.  But I was afraid of what would happen to my
mom and how she would have felt.

Other ways I dealt with the pain would be to drink
alcohol, as well as physically punch walls or slam my head
against the wall.  There were also plenty of nights throughout
my life that I couldn't sleep because I was in a constant
state of mind wondering what would happen next.  I would keep
to myself at night to try and sleep, and if I couldn't sleep,
I would hope and pray that I would die.

There were also nights I would lie in bed and cry myself
to sleep.  If mom or dad came to check up on me because they
heard me crying, I would lie and say I had a bad dream.  I
never wanted to tell anyone how I felt since I didn't know how
they would have imagined me or thought of me.

Emotionally, I felt very depressed and anxious.  I always
wanted to be at school because if the Defendant was around, I
dreaded the thought of knowing that at 3:30 p.m., school would
end, and I would have to go to him and not know what would
happen with him from the time I got there, my mom came home
from work.

In my head, I would always question if it was -- if I was
important to the Defendant or just some object for him.  I

always felt like an object to him and never truly a relation.
If anything, I felt more like an animal, like a dog to him.
Even though I felt like a dog to the Defendant at times, I
would always try to find the good in him to get him to realize
that what he was doing wasn't right but it never sank through.

When I was younger going through all of this, I felt like
a peasant, who was ruled by kings and queens.  I felt very
disgusted and like trash.  Now, going to therapy every week,
it makes me feel like I am up there with kings and queens.  I
am not a peasant, and I am no longer disgusted at myself and I
am not a piece of trash.  If anything, I am like Macbeth with
shining armor or like Zeus, the Greek god, ruler over all
gods.  Sincerely, Minor Victim 1.

THE COURT:  Thank you.  Just for the record, I note
the Court has reviewed the victim statements that were
submitted at Docket 51.

Mr. Esposito, you have the right, sir, to make a
statement to the Court, and if you wish to make a statement,
now would be the appropriate time.  I should have asked, is
there any evidence for the defense, Ms. Beitz?

MS. BEITZ:  No, Your Honor.

THE COURT:  Thank you.  Go ahead, please, sir.

THE DEFENDANT:  I do.

Your Honor, before I begin, I need to tell you I have a
learning disability that makes it, that makes my thoughts get

jumbled.  At times, they get ahead of my words.  This causes

words and sentences to be seen and become in random order.

They will get jumbled, repeated, and some words get lost.

This can make it difficult to get my thoughts, feelings, and

emotions across to others so they understand what I am saying.

So please bear with me.

There is nothing I can say or do today to change what I

did — I can't finish it.  I am sorry.  I don't know where I

left off.  All I can do at this time is say how deeply and

truly sorry I am to my son, wife, my family, and this Court.

I still can't believe that I did what I have done to get me

here today to do such horrifying things with a child, let

alone my son, is way beyond my understanding.

My actions disgust and sicken me.  Behavior like this was

never my intentions when adopting my son.  For 45 years I was

a normal everyday person.  Thoughts and actions of this nature

never entered my mind.  Obviously, to do something this

repulsive is so far out of my character.  To have me here

today, something bizarre must have happened to me to cause me

go off my course of good sense and values.  This person is not

who I was before or who I will be.

I need to not only find out what happened but why it

happened, why I allowed myself to fail as a dad, but I need to

correct it.  I want to correct it, and I need to get the help

to correct — sorry, I can't see.

For the past 22 months, I have spent my days trying to understand all that I put my son and wife through and what the children in the videos must have felt, how it will affect the rest of their lives.  Trying to figure out where, when, and why my good sense and values went off course, how I could allow myself to do these things with my son, how this affects their daily lives, how different their lives truly are now.

My actions forced them to give up their lives, home, independence that my wife and I worked so hard for.  I forced my wife and son to move in with family in Connecticut.  I left them alone to do all the things I did for them.  I let them down in so many ways.  I think of the future, happy memories we should share together that I have taken away from them.  I not only changed their lives, but our relationships forever.

As devastated over this as I am, it fails in comparison to what my son must be feeling, going through, and what he will have to deal with for the rest of his life.  There are a lot of unknowns about his future, but not everything is left to speculate over.  He has written me about his days and weeks after my arrest.

I hear about most of the obstacles, fears, and healing my son and wife are, can, and will endure:  The mood swings, their sleepless nights, the nightmares, all the questions I hear, their anger, frustration, and disappointment when they talk to me.  And I hear it direct from them.  I never hear it

third party, and they tell me all about it.  They don't ever hold anything back.  I know this is only the beginning.  There is so much more pain, fear, so much unknown for his future, so much he and my wife will endure and deal with as time goes on.

Up until today, you have seen and heard much about a guy, who for reasons unknown, let his good sense and judgment fail to the point where he would let one of his top three dad core values of love, protect, and provide fail.  I let my duty to protect — I let my duty to protect him from harm fail.

Yes, I do, and always will love him unconditionally.  I will do all I can do to provide for him the best I can as in the past.  This is evident by my paying my child support with my 2018 tax refund.  While it is only a small thing, it is the best I can do for them at this time.  I was a very weak guy who let — I was a very weak guy who said things to act more impressive than he was to convince others he was someone he was not.

There is a much larger portion of our lives, as we were a very close family.  You need to be made aware of that over 110,000 pictures and videos of our great times together, there were thousands of times at least.  They range from average little things to day trips, competitions, vacations, first everythings, and so much more.  Even though I failed to fully protect them, I attended his school conferences and meetings about his grades.  I attended soccer games, wrestling matches,

1   taught him to drive.  I made sure I was home for his important

2   life events and lots of the unimportant ones as well.

3       I still make sure his grades are on point to maintain or

4   exceed his 3.5 GPA.  When I found out he told the truth, I

5   reassured him that it was okay and it doesn't change the love

6   I have for him now or ever.  That he is and always was —— he

7   is and always will be my son, no matter what.  There

8   is —— see, he still has a strong will when it comes to his

9   core values we taught him.

10      I forced him to go through four other major negative life

11  events without me there to directly and immediately comfort

12  and support him:  The death of his best four-legged friend,

13  surgery on his shoulder, and most recently, the

14  hospitalization of his grandfather, and the death of my

15  stepmother.  I provided a comfortable home, safe and reliable

16  vehicles for his travels to and from his training, school, and

17  everywhere else he had to go.

18      I made sure all their needs were taken care of.  I still

19  do my best to be there for all his highs and lows.  To be

20  supportive of them, involved and help my son, wife the best I

21  can.  I have been with my wife for over 35 years, almost 27 of

22  them married.  My wife and I agreed to divorce in May of 2018

23  to help them start the healing process both mentally and

24  financially.

25      Prior to this, I was in the fire service for 37 years ——

13 years as a volunteer firefighter and officer, 27 and a half
years as a fire rescue, law enforcement vehicle design
specialist, dealing with all levels of state, federal, and
military government in the U.S. and Canada until December of
2013, where I lived and worked in Indiana during the week and
with them on the weekends in Ohio.

From Day 1 of my arrest I have been told my case was
different, and for the largest time -- excuse me, for the
longest time I did not believe them.  Upon reflection on it,
they are right, but not in the way most think.  We are a close
family.  We are not as close as we were -- excuse me.  We are
not as close now as we were before, but we are still close.

My wife and son chat at least once a week, as well as I
send weekly letters.  Our relationship is not what it was
before this.  There is still love and caring for each other.
We discuss anything and everything ranging from finances to
school to grades to girls, wrestling, and anything they want
or need to discuss.  I am mostly aware of all that is going on
in their lives and still involved.

I want to be there to help them get through this, to be
part of the healing, and we do worry about each other today as
we did in the past.  I have taken responsibility for what I
have done with my son, the videos I possessed of the others,
and offered to provide information as best I could with other
cases, knowing there was no plea deal, that this case had the

1     potential for a life sentence.

2         I made the decision early on that I would not be willing

3     to put my son and family and other victims through any more

4     than they already have gone through.  This has not changed the

5     fact that I failed as a dad, a husband — and a husband.  That

6     I led my son into danger, not only did I video things, but I

7     shared them, and I, that I have no control over what could be

8     done with the videos or who, if anyone else, has them and has

9     done anything else with them.  As they are now beyond my

10    control, I worry about how this will affect their futures all

11    because I allowed something to change my values that I did not

12    see.

13        On Friday, January 3rd, I was told there was a packet

14    coming from my lawyers containing victim impact statements,

15    including one from my son.  As of yesterday, I have still have

16    not received it.  I did receive it last night around

17    10:00 p.m.  My lawyers did, however, read me my son's, and it

18    tore my heart out and stomped on it.  Until I heard that, I

19    never knew how deeply this hurt my son, that he felt the way

20    he did about me and our home, that he had thoughts -- that he

21    had those thoughts.

22        Because whenever I left on trips and recently left to go

23    to Indiana, it was always I love you.  I can't wait until you

24    are home.  I miss you.  When you get home, can we do things?

25    Even now when we speak, it is I love you, I miss you.  It is

1    asking advice, worrying if I am okay.

2         While I have not yet received the other letters, my son's
3    letter gives me a great insight and perspective into what he
4    and the other children in the videos I have and the child
5    whose father I had chatted with must have gone through, felt,
6    and will always feel, the constant fear, anger, and the
7    what-ifs for the rest of their lives, the lifetime of healing
8    they will go through.

9         I do want to read them, as well as my son's.  I want to
10   further understand what these kids have gone through and how
11   they felt.  I know I have screwed up in a big way.  There is
12   no one else to blame for this but me.  I am solely
13   responsible.  I live every day knowing that, knowing that I
14   removed myself from their lives, that I broke their trust,
15   promises, and hurts, that I failed to fully protect my son to
16   make him feel safe, and I failed to be there for them when
17   they need me, that I turned their lives upside down.

18        I can't go back and change the past because if I could, I
19   would.  All I can do is move forward with them and help
20   them -- help heal their lives, to get answers to why this
21   happened, to be able to correct it.  So when I get released,
22   no one will ever worry about -- excuse me, worry about any
23   behavior like this happening again.

24        I am the same person who loves them unconditionally.
25   They are -- excuse me, they were and are my number one

1    priority.  I worry about how today's outcome will affect them.

2    My wife and son are special people who look beyond the flaws

3    and see the good in others, who don't deserve any more pain

4    than I have already caused.

5         Like a drug addict and an alcoholic, I was blinded from

6    my good sense and values.  I allowed myself to be surrounded

7    by others who felt my actions were acceptable.  But I

8    also -- but also, like a drug addict and alcoholic who is

9    motivated to make themselves a better version of who they are

10   of who they were before, who have a family to support them,

11   proper treatment and counseling, and to have removed

12   themselves from the negative environment can be rehabilitated,

13   so can I.  Because I am extremely driven and committed and

14   willing to do whatever it takes to make myself a better

15   version of who I was before, this approximate five-year period

16   of my life when I went off course.

17        I know the support of my family, along with counseling

18   and any other needed professional help I will be getting and

19   will continue to get, adding my commitment to proving not only

20   to my family, this Court, but to everyone, including myself,

21   that I can be a better version of who I was before, I will not

22   fail, if given the opportunity.  I can return to society once

23   again to be a productive, law-abiding, loving person like I

24   was before all this happened.

25        I am asking for your help and understanding to get me the

1   help, the needed help and counseling not only for now but for

2   the future so when I return to society, I am already on the

3   path for success.  Thank you.

4            THE COURT:  Thank you.

5        Argument, Ms. Beitz?

6            MS. BEITZ:  Your Honor, with the Court's permission,

7   both Mr. Dazey and I will wish to make a statement on behalf

8   of Mr. Esposito.

9            THE COURT:  Sure.

10           MS. BEITZ:  But I am going to begin with

11  acknowledging how serious this case is.  There is not a time

12  that I stand in front of a court in one of these cases where I

13  don't start by saying "we understand the seriousness" because

14  these offenses target the most innocent members of our

15  society.  They target children, they target the vulnerable,

16  those who we should be protecting, and I understand the Court

17  is going to weigh that very heavily in making your decision

18  today on what an appropriate sentence is.

19       So any of the arguments I make are not to minimize the

20  pain Minor Victim 1 went through or the pain the other

21  children in the videos have gone through and continue to go

22  through as evidenced by the fact that Mr. Esposito possessed

23  them; and again, I know the Court must weigh that, and that

24  has to weigh very heavily on your mind in making this

25  decision.  But in making this decision we are asking the Court

1    to come up with a reasonable sentence, and that is difficult

2    in a case where the harm here is extensive and where the harm

3    has been lengthy.  But there is evidence here for the Court

4    that there is some healing.  There is some hope for Minor

5    Victim 1, certainly hope for the other children involved in

6    this case that they are able to move past this with

7    appropriate counseling, with strong parental figures or other

8    people in their lives to help them move past this, and we are

9    hopeful for Minor Victim 1.

10        His statement was powerful not only to read, to hear, for

11   Mr. Esposito to read.  We have read it to him now.  He has

12   heard it twice, and he told you it impacted him greatly, just

13   like it did all of us.  His pain is real, but trying to wrap

14   our heads around the Government's request for the absolute

15   maximum sentence in this case has also been a struggle.  The

16   Government is asking for 620 years.  It is a number that, at

17   some level, just stops making sense.

18        When you think about 620 years in the context of history,

19   that reaches all the way back before the renaissance, to the

20   dark ages, before you had printing presses, before you had

21   established churches that were able to send out Bibles, before

22   Martin Luther wrote his 95 theses, all the way back before

23   parliament even passed the Habeas Corpus Act in 1679.  620

24   years reaches all the way back before we started really having

25   civilized organized societies, and that is what the Government

1  is asking for now without regard to some very important

2  things.

3      First, his decision to plead.  He pled without an

4  agreement.  An agreement wasn't offered.  He chose to accept

5  responsibility.  He chose to sign and agree to — or he agreed

6  to the extensive factual basis that the Government presented,

7  which saved the victims in this case, and most importantly,

8  Minor Victim 1 from having to go through this in front of a

9  roomful of strangers, to have to explain the pain again and

10  have to articulate it in front of him in this room.  That

11  matters.  That has to mean something.

12      As the Government speaks about deterrence and about the

13  message that they want you to send to society and to the

14  victims about how serious this case is.  Giving a sentence

15  like that also sends a message to other offenders.  It doesn't

16  matter if you plead because you are going to get the exact

17  same sentence.  You are going to get maxed out whether or not

18  you do the right thing and not force them to come into court

19  and go through this again.  So you might as well go to trial.

20      We hear that all the time, Your Honor.  What do I get?

21  What is the point of pleading?  At least if I go to trial I

22  save some appellate rights.  Maybe there is a mistake that

23  happened.  I can continue to fight my case while I am serving

24  this sentence in prison.  That is hard for us when we have to

25  look clients in the eye and tell them, what are the benefits

1  for you?  And in this case, the Government is saying there are

2  no benefits.  They don't acknowledge, at all, that he made

3  that decision in asking for the absolute maximum under this

4  case.

5      Sending him out with a 620-year sentence, while taking

6  him out of this society puts him in a different community, and

7  it is a community where we are sending him to with no hope

8  with a sentence like that.  The Court is well aware of the

9  importance of having hope while you are in prison.  It

10 incentivizes you to do programming, and it allows you to do

11 programming.

12     If you go on with a sentence that is 620 years, there is

13 no reason to put him in programming because there are other

14 people who we know are going to be coming back to society who

15 are going to get the first shot at doing that, and when you

16 will send somebody in there with no hope in a community like

17 that, it is also dangerous.  And the Court knows that from

18 seeing the cases where people go in and they have nothing to

19 lose.

20     It is dangerous to the guards that are there.  It is

21 dangerous to the other inmates, his cellmates if we send him

22 there with no hope and saying, we don't think you are worth

23 anything but 620 years.  That is what we think this is worth.

24     It also doesn't acknowledge his true remorse, which is

25 evident in his decision to plead guilty.  And you saw today,

and he told you today how he now accepts and understands how difficult this was for Minor Victim 1 and for his wife and the destruction that he has left behind him.  He accepts that.

Now, while he honestly tells this Court he doesn't know how it happened, that is also something positive because it tells you he is open to understanding.  He wants to understand how did this happen.  He wants the ability to get the counseling he so desperately needs.

I know the Government has a lot of cases that they have compared to you and given to you in their briefing to say, you know, this sentence can be reasonable because other courts have stacked.  We can come up with cases, too, and say there are other cases where that didn't happen, and that judge found that to be reasonable.

I only want to talk about one, and that is because it was in front of this Court and because I know Mr. DeBrota is familiar with it, and that is the Bostic case.  There is no question that that case was also severe and horrible, multiple victims.  Mr. Bostic received 315 years from this Court, and the Court did a very extensive calculation as to why that was appropriate, going through each and every charge; and quite frankly, dividing up victims, as well as time frames.

The Court added consecutive sentences when a child was younger and then later when the child was older, and it was a great deal of thought given to that 315-year sentence.  That

1    case also included the images of urination, bondage.  It

2    included babies, and he had a prior, if the Court recalls.

3            THE COURT:  Uh-huh.

4            MS. BEITZ:  He came in with a prior, and one of the

5    things that struck me when I was reading the Government's

6    argument in that case was why they thought it was so

7    aggravated, and I know the Court also encompassed this in your

8    determination as to what was appropriate.  And one of the

9    things he said was that the victims in this case, his victims,

10   his live victims that he produced, they were very, very young.

11       They were the type of age where the victim is not likely

12   ever to be able to testify in a case or report their

13   victimization.  That makes him more dangerous to people than

14   people that are attracted to, say, eight- or ten-year-olds.

15   That is a true statement.

16       When the Government presented that to the Court, they

17   pointed out why Mr. Bostic's case was more aggravated than

18   others and other individuals who are attracted to eight- or

19   ten-year-olds because babies, as Mr. Bostic was victimizing,

20   could not verbalize what was happening, didn't have the

21   ability to report it, and that made him more dangerous.  And

22   it widened his ability to continue that type of abuse.

23       And Again, not minimizing what happened to Minor Victim

24   1, but this case falls squarely into what Mr. DeBrota argued

25   then, that he is not as dangerous as someone like Mr. Bostic.

1    Minor Victim 1 did have ability to report, and he did.  It was
2    hard, and it was difficult, and I have watched the video.  It
3    was not easy watching him talk about it, but he was able to
4    articulate, give timelines, and report what had happened to
5    him.  That does distinguish this case.  620 years ignores that
6    very principled argument that Mr. DeBrota made in Mr. Bostic's
7    case.  This case is different and doesn't deserve the 620
8    years.
9         I am going to turn this over to Mr. Dazey now, Your
10   Honor.
11             THE COURT:  Thank You.  Mr. Dazey.
12             MR. DAZEY:  I will be brief.  I suspect all of us
13   have continued experience of waking up from a disturbing
14   dream, have had relief wash over us to find that it was just a
15   dream, find out it wasn't really three hours late to pick a
16   jury.  I wasn't really a serial killer.  I didn't really just
17   blow my marriage up over something stupid and wonder,
18   sometimes, how it feels to wake up in the Grayson County
19   Detention Center and open one's eyes and realize it wasn't a
20   dream, at all, that it is real, that those things that seem
21   like they came from another lifetime or another world actually
22   happened, and that this situation is not going to go away.
23        Mr. Esposito has, for reasons I can't begin to
24   contemplate, enjoyed the continued correspondence and contact
25   with his family while this case has been ongoing.  I wonder if

1    all three of them are on some kind of a different reality in

2    terms of trying to work through what has happened and what is

3    going to happen to all of them as a family.  I think it is

4    fair to think Mr. Esposito is most hopeful that somewhere in

5    the future lies redemption and forgiveness.

6         I suspect that he will find forgiveness.  Redemption, of

7    course, is a tall word under the facts of this case.  If the

8    only factor in sentencing were the offense conduct, this would

9    be a simple decision.  The offense conduct is beyond

10   significant and beyond serious, and if that were all that

11   drove a sentencing decision, this would be simple.

12        Our argument is that somewhere along the line the rest of

13   Mr. Esposito's life deserves some kind of consideration.

14   While the Government would be right to point out that the

15   offenses before the Court represent a long-standing series of

16   crimes, he isn't really a first offender before the Court.

17   But he hasn't been a person who has been charged with a crime,

18   punished, didn't learn his lesson, came out, and reoffended.

19        He is before the Court to be sentenced for the first time

20   in his life at the age of 55.  I pointed out in the memo filed

21   that if this offense or if the sentencing decision were a

22   sporting event, 420 months would be the over-under.

23   Statistically, a sentence of 420 months will expire precisely

24   when the Social Security Administration would anticipate Mr.

25   Esposito to expire.

1    I suggest it is, that the sentence on the far side of

2    that somewhat bright line is more appropriately reserved for

3    the Defendant, who had been punished, reoffended, did not

4    accept responsibility, harmed his victim in some physical,

5    greater physical way, threatened, obstructed justice.  There

6    ought to be room on the other side of a life sentence for that

7    incrementally more serious case, the case that doesn't involve

8    acceptance of responsibility or an otherwise life of hard work

9    and support of his family.

10    So all things considered, our suggestion is that

11    somewhere on this side of 420 months lies a sentence that

12    takes into account not only the offense conduct but the -- his

13    personal history and characteristics, the rest of his life,

14    his actions and acceptance of responsibility, and that

15    expresses hope for forgiveness and redemption.

16    Thank you, Your Honor.

17        THE COURT:  Thank you.

18    Ms. Kupersmith?

19        MS. KUPERSMITH:  Thank you, Your Honor.

20    Your Honor, this Defendant may not have a criminal

21    history or a prior offense, but he is certainly not a first

22    time offender.  This is just the first time he was caught.

23    This is not a simple lapse in judgment.  It is years and years

24    of abuse and production of abuse material, years and years of

25    collecting, distributing, and soliciting child pornography.

1   His actions, just online, require computer sophistication,

2   attempts to evade law enforcement by being on the anonymous

3   network, the dark web.  These are not sites that you can get

4   to accidentally.  Even the chat programs require specific

5   special computer knowledge, require special software to get on

6   them, and knowing the exact 16 alphanumeric site name which

7   means when you go on these sites, you already know why you are

8   there.  These are just not things you can Google.

9       The Defendant had usernames and addresses to a number of

10  sites that were devoted to the sexual exploitation of

11  children.  Even at arrest, he spoke of how his belief was that

12  a child as young as eight years old could consent to sexual

13  relations.

14      This is not just a simple, I am not sure what I was

15  doing.  This was a lifelong plan; but also, Your Honor, I know

16  we are here to sentence the Defendant, but to focus the

17  Court's attention on the victims.  Of course, Minor Victim 1

18  sustained the years of torture and abuse at the hands of the

19  Defendant, and psychologically, as we heard from his letter, a

20  significant violation of the trust based on his relationship

21  with the Defendant.

22      There were multiple sexual acts throughout his childhood

23  in multiple locations.  If he was with the Defendant, he was

24  not free to be a child.  In his interview he talked about

25  these boys' weekends that he would have with the Defendant

32

where he was promised that he could do something fun for himself, but he knew what that meant in return.  In return, it meant doing sexual things the Defendant wanted to do.

We saw on the chats between the Defendant and other offenders that the only time the Defendant played the caregiver role was to get something in return.  He talked about how he gave him Christmas gifts, and he was excited for the thank you sex he would get.  Between that and these boys weekends that the victim talked about, things that were provided for this victim, like the comfortable home, were taken away because of what was happening to him.

Besides the abuse itself, Minor Victim 1 was made to watch other material of sexual abuse.  He was made to communicate with other offenders and their victims.  He was told he needed to recruit another boy for the Defendant because Minor Victim 1 was getting older and starting to learn to say no.

In the interview, one of the many heartbreaking moments was when Minor Victim 1 said he wished he could find and talk to one of the other victims that the Defendant made him talk to online.  He wanted to tell him that even though Minor Victim 1 would say that he liked the things that the Defendant did to him, that was because the Defendant told him to do so, and he was sorry for lying.  He wanted to find that person and explain to him the truth.

1    Thanks to the Defendant, the recordings of Minor

2    Victim 1's abuse will be circulating online, likely for the

3    rest of Minor Victim 1's life.  And then, besides Minor Victim

4    1, there were other multiple victims who were abused

5    specifically for the Defendant's benefit.  Because of

6    Defendant's communications and relationships with other

7    offenders, certain children experienced abuse that but for the

8    Defendant's request for material, they would not have

9    experienced.

10    Hundreds of victims were exploited for Defendant's

11    benefit just through his consumption and circulation of their

12    images and his part in the supply and demand for child sexual

13    abuse material online.  From just what was found on his

14    devices, the National Center for Missing and Exploited

15    Children had 52,587 unique image files identified, almost

16    2,000 unique video files, comprising about 359 different

17    series of children, and that does not count the multiples that

18    were found throughout the devices, nor does it count the

19    countless children who have yet to be identified.

20    I would refer to the victim impact statements that were

21    filed for these other so-called possession victims who are

22    just a handful of those that were found on the Defendant's

23    devices for the impact that just having this material has on

24    their lives and what, and how the circulation of their images

25    is not a victimless crime and contributes to their suffering

1    almost as much as the creation itself.

2          Your Honor, I understand that the Defendant is now

3    showing remorse and believes that with treatment that he can

4    be better; however, the heinous characteristics of the

5    Defendant's offense is not something that just simply goes

6    away when the Defendant gets older.  He only got stopped and

7    caught and saved -- Minor Victim 1's life was saved only

8    because of the investigative work that went into catching

9    another offender and some clues that were left behind by the

10   Defendant in the chats.

11         In the interview, at first, with the minor victim, he

12   denied that anything happened to him.  And when he was shown a

13   picture, a sanitized version of the picture and the

14   interviewer told him, "I am here because I am afraid this is

15   you."  The victim said, "I want to say that that is my dad,

16   but he wouldn't do that to me."  And then, he then disclosed.

17         This is not a situation where Minor Victim 1, despite

18   being older than the victims cited from Bostic, would have on

19   his own disclosed the abuse.  Whether it was through the fear,

20   whether it was through the relationship with the Defendant, or

21   whether it was through the manipulation of years of abuse,

22   Minor Victim 1 only disclosed because he was confronted with

23   what happened, and he knew that he was finally safe.

24         But for the investigative work that led to that other

25   offender, which then led to the Defendant, Minor Victim 1

1   would still be fearing for his safety, would possibly finally

2   be forced to obey the Defendant's desire to recruit another

3   victim or possibly would have taken his own life.

4       In all the years of abuse, Defendant did not have moments

5   where he put Minor Victim 1 first, and thought about, instead,

6   he replaced it with his own selfishness and perverse needs and

7   did not think about how this was hurting Minor Victim 1 and

8   his childhood until now, when he is faced with Minor

9   Victim 1's words.  And yes, it is great that he spared Minor

10  Victim 1 a trial, but that wasn't an act of complete

11  selflessness either.  It was the reality of the evidence

12  against him and of finally being caught.  His acceptance of

13  responsibility now does not erase or make up for his years of

14  conduct.

15      I would focus just on the actions in the first 20 counts

16  that involve various sexual acts, involved bondage and

17  physical torture, even the Defendant's denial initially of how

18  many times such extreme acts of bondage took place that were

19  not represented in the files that were found on his devices.

20  The use of objects and devices in various orifices of Minor

21  Victim 1, instruction to Minor Victim 1 to say and do certain

22  things, urination onto his face and his mouth while he choked

23  and protested, over years in and different ages of Minor

24  Victim 1's life.

25      Looking at the material on his devices, this is not just

someone who is content looking at some favorite pictures or
videos online.  The sheer volume of material speaks to how
long and how pervasive his obsession was of collecting this
material.  The grotesque nature of the material involving
children as young as three years old and S&M material,
hundreds of sex stories that laid on in grave details
fantasies of abuse and torture of young children, making them
into sex slaves.

And for the Defendant it did not just end with
downloading and reading about these fantasies.  He had to act
them out.  He discussed online with other offenders his plans
for another child.  He encouraged other offenders to abuse the
children they had access to for his benefit and send him more
monstrous material.

He discussed possibly meeting up to abuse each other's
victims, and he discussed one of the — with the offenders
paying to kill his wife to have more access to his victim.
There was a video on his devices that showed ropes on the bed
in position of someone being tied up, where the Defendant
narrated in a low whisper what he did to that child and how
Minor Victim 1 was next.

And whether these other children that he discussed were
just fantasy or never identified, we know that Minor Victim 1
was real.  We know that MM's victim was real, and we know what
happened to them.

1    There was another video on his devices which panned over

2    multiple sex toys and S & M objects; and again, in a narrated

3    voice, the Defendant said, these are waiting for Minor

4    Victim 1 for when he comes.  That wasn't fantasy.  That wasn't

5    reality, and it was a tortured reality for Minor Victim 1.

6         At all times Minor Victim 1 had to fear for the abuse,

7    had to suffer psychologically, questioning his own worth and

8    his own existence, as he says in his own words.  And for his

9    sake, the Defendant needs to stay in prison not until he is an

10   old man, but actually, for the rest of his life.

11        Your Honor, if Your Honor would like to hear more

12   comparisons with the Bostic case, I would turn it over to my

13   cocounsel.

14        THE COURT:  It was my case.  So if you want to say

15   more, I will not stop you, but it was my case.

16        MR. DeBROTA:  My thought, Your Honor, is since there

17   is no waiver of appeal, it would be important to lay out some

18   of the salient facts so that we don't have to rely strictly on

19   comparisons after the fact, with the reported decision in

20   Bostic, which is a reported decision.

21        Let me point out the few things about the Bostic case,

22   and I am sorry, my throat is sore.  David Bostic was around 19

23   when we caught him.  His prior conviction was for a juvenile

24   offense.  His victims, there were approximately five who were

25   under the age of five, and they were victims he had access to

1    through baby-sitting.

2        He was in a group of people who traded, by e-mail, in a

3    group of e-mail and discussed principally the abuse of

4    infants, toddlers, and young children.  That is what David

5    Bostic was doing.  He was doing extreme material in the sense

6    that he was -- the age involved was extreme.  He was not doing

7    extreme material in the sense of urination, choking, pain in

8    the sense that we are talking about with this Defendant.

9        His communication with the other Defendants in that case

10   is not nearly as robust as the communications and social

11   networking of this Defendant within his Tor group, and the

12   production of his material is not nearly as focused as we are

13   featuring here.  David Bostic also presented hours of

14   testimony on mental health issues that ultimately didn't

15   matter too much in the sentence you imposed, but we have no

16   such information whatsoever about this Defendant having any of

17   the type of mental health supposed challenges that were a

18   strong portion of the sentencing hearing in the Bostic case.

19       The analysis that the Court did in Bostic was basically

20   to consider the events in the productions separately, and you

21   accounted for some being a baseline of 15 years per count and

22   some more serious than that.  Under that analysis here you

23   would be multiplying, at a minimum, you would be multiplying

24   the 21 counts -- the 20 counts of production times 15.

25       But we would suggest the analysis you did there would

1  suggest a baseline production, like Bostic did, was worth 15
2  years, and some were higher.  When we are talking about
3  productions on Minor Victim 1 being a close relative with
4  sevenish years of abuse, not five, the fact that he was
5  adopted, the extreme psychological harm that would accompany
6  normalizing the type of sexual behavior here, that enduring
7  harm is as equally profound as the problem that very young
8  victims don't have a voice to speak.

9       The likelihood today is that the infant David Bostic
10  victimized has no memory of that.  The certainty for today is
11  that Minor Victim 1 is never going to get over what this man
12  did for seven years of behavior.  So although the harm is
13  different and the reasons why we punish greater crimes against
14  little kids who can't speak, at all, that is a value, but
15  equally important and as applied to this case, this man's
16  behavior is not substantially better than David Bostic's.  And
17  David Bostic's behavior has much about it that was quite
18  terrible.

19       What the cases are alike in is David Bostic confessed on
20  the day of his arrest and pled guilty.  He didn't put anyone
21  through trial either.  In his case, he would have had victims
22  who couldn't have testified for the most part, but he took the
23  same line of basically accepting responsibility as well.  So
24  that is equally true, but the most profound difference between
25  this case and David Bostic, David Bostic, when they caught

1   him, was 19 or so.

2       This man, when he started doing the crimes that involved

3   his adoptive son, was in his late 40s.  He was 52 when we

4   caught him.  He is 54 today.  So this is not a situation where

5   we have a 19-year-old with a prior juvenile conviction who

6   then commits terrible federal crimes.  This is a situation

7   where a mature adult father parent did what he did here on a

8   long-standing pattern of behavior.

9       So we don't see any reason why this Defendant ought to

10  receive the type of sentence the defense is requesting, as a

11  comparison to the Bostic case.  The other cases we cited in

12  our brief also stand for the proposition of multiplying events

13  by the mandatory minimum to get an idea of where we end up.

14      The final point is, the reason this sentence isn't the

15  word life is the statute just isn't designed to do that.  In

16  Bostic's case, his prior conviction was in the same posture.

17  It didn't cause the word life to be mandatory because it was a

18  juvenile conviction.  So in cases where you have prior

19  convictions, you just get life for this.  Courts have no

20  discretion.  It is two strikes and you are out, essentially.

21      Here you do have discretion, but the guidelines are

22  suggesting it should be used in such a way.  And we think

23  under the factors in this case, 3553 factors, this is a person

24  who should receive an effective life sentence.  And we think

25  the calculation of the type done in Bostic, or as we suggest

1    here, is the correct way to do that.

2              THE COURT:  Thank you.  Go ahead.

3              MS. KUPERSMITH:  Your Honor, just a few more final

4    thoughts.  The guidelines in this case are literally off the

5    chart.  Even with acceptance of responsibility, he is at level

6    51.  It becomes 43 only because the chart ends, and as we

7    submitted in our sentencing brief, there is a few factors that

8    are actually underrepresented in that guideline calculation.

9         Whether a Defendant receives 620 years or some other

10   amount of years that is an effective life sentence may not

11   actually make much of a difference to him, but it does to the

12   victims.  Saying this Defendant's crimes were so horrific or

13   so damaging or so appalling that he deserves the maximum

14   sentence allowed by law is saying something to Minor Victim 1,

15   to each instance of abuse that he is charged with, to every

16   minor he exploited, to every image he possessed and shared,

17   and to every other offender weighing the risks and benefits of

18   committing these crimes.

19        The Defendant may live 27.9 more years or may live more

20   or less, but he deserves to be in jail for the rest of his

21   life, regardless.  And the victims deserve their suffering to

22   be heard and to be able to recover, knowing that the Defendant

23   will never get out.

24             THE COURT:  Thank you.

25             MS. BEITZ:  Your Honor?

1          THE COURT:  Yes.

2          MS. BEITZ:  I wanted to state one thing, that I know

3   Mr. DeBrota didn't mean it this way, but I am not arguing that

4   what happened here was better than what happened in the Bostic

5   case.  There is nothing better about any of the facts in any

6   of these cases in front of the Court.  Whatever sentence you

7   hand down today, there will be no winners.  Nobody is walking

8   out of this courtroom today feeling good about what is about

9   to happen.

10         All I am attempting to do is put this in some context and

11  ask the Court to be reasonable in comparing it to other cases

12  that are similar, and I do -- having read the Court's words,

13  that case did involve the images of urination, bondage as

14  well.  And that is the reason I presented it just as a

15  comparison for the Court's consideration.

16         THE COURT:  Okay.  So let's discuss the nature and

17  circumstances of the offense because it is where the statute

18  begins and I will as well.  To use the word "torture" in this

19  case to describe some of the conduct is not an overstatement.

20  It is not hyperbole or the horror of what happened.

21         The videotapes established that the Defendant whipped his

22  child in Count I.  He urinated on his child.  He urinated into

23  his child's mouth, that is Count XX.  On numerous occasions he

24  raped his son.  That is indicated in the counts as detailed in

25  the presentence report where he anally penetrated his son.  He

1  raped his son with objects.  He directed his son to

2  communicate with other victims about what sex acts they should

3  perform.

4      And so when I look at -- I am not looking at any other

5  case.  I am looking at a father doing this to his son.  So

6  whatever differences there are, I can think of nothing more

7  horrible, no greater betrayal, no greater abuse, no greater

8  psychological and physical damage that an individual could

9  cause to his own child, and I think that Minor Victim 1's

10 words establish how he felt, the worthlessness, the suicidal

11 thoughts.

12      And then, I am left to consider the Defendant's

13 statements about their continued communication; and so, the

14 confusion that Minor Victim 1 feels.  Every child, whether

15 adopted or not, wants to think their father loves them, wants

16 to think their mother loves them, and so he is trying to

17 struggle through all of that.  This Defendant objectified this

18 child in ways that are just unthinkable, really, and then, to

19 sort of trade on this, these acts with other perpetrators is

20 really just unspeakable and horrifying.

21      While Minor Victim 1 was perhaps physically able to

22 speak, the pressures of the relationship would have prevented

23 his communication of this; that is, in fact, what happened.

24 We know that is what happened, and as the Government pointed

25 out, until confronted with the proof, he wasn't going to do

1    that to his dad, despite everything his dad did to him, he

2    wasn't going to tell on his dad.

3        The Defendant's history and characteristics were somewhat

4    discussed in the characterization of the conduct that I have

5    just described.  Yes, he provided for his family for a

6    significant period of time.  I have no idea, neither does the

7    Defendant, as to why his life turned to this very horrifying,

8    but what he did to this child, in the Court's view, was

9    dehumanized him.  He dehumanized him.  He objectified him, and

10   that is something I don't know that I, that I have seen in

11   such a personal way, so personally from a father to a son.

12       So that, that is a completely distinguishing factor with

13   Bostic because I think as the Government notes, those babies,

14   yeah, they couldn't talk, but there was some film of that,

15   like the Defendant had here.  But also, our hope was in that

16   case, that they wouldn't have a memory of it.  We know that

17   Minor Victim 1, like all the other children that are

18   encompassed in Count XXI, have very vivid memories and very

19   real fears that they are going to be recognized.  That is a

20   legacy that this Defendant has left his son, that he will be

21   recognized for the pictures that are now on the Internet in

22   perpetuity.

23       So I want to talk about also within the context of the

24   Defendant's history and characteristics, the argument made by

25   defense counsel that acceptance of responsibility has to count

45

for something.  It does count for something, but the
Government made an appropriate counter, which is, this is on
video.  So it is not as though maybe Minor Victim 1 even would
have had to have been called as a witness because all these
videos could have been authenticated.  So that is significant.
There was a mountain of evidence created, as it turns out, by
the Defendant, that led to his being arrested in this case and
some really pretty terrific police work to get him identified.

And the defense has also asked me to consider his hope.
You know, all of this is sort of bounded by a very random
fact, and that is, that I have no control over, which is his
age and his life expectancy.  And so I find it difficult for
me to set aside the horror of his conduct because of a random
fact of his life expectancy that I have no control over.

And I am mindful of the Circuit's direction to us to be
thoughtful about whether we want to impose mandatory life
sentences when statutes don't cover them, but there are a
series of horrific acts here that I have discussed:  Bondage,
urination, beating, rape, rape with objects, that I don't
think can be minimized just because the fact that the
Defendant has a 28-year life expectancy.  And as for concerns
for defense counsel as to what to tell people about why should
I plead?  Maybe they won't have committed these types of acts.
I don't know; but to me, that is not the concern for today.

The concern for today is to follow the statute and

1    reflect the seriousness of the offense that I have just

2    described and to promote respect for the law.  The Government

3    has detailed the elaborate nature of the Defendant's

4    engagement in the dark web to accomplish these crimes and to

5    trade on the abuse of his son.  I also have to think about a

6    just punishment, again, without bearing in mind the random

7    fact of his 28-year life expectancy.

8         One thing no one has talked about but that was on my mind

9    in Bostic, and it is on my mind today and it was on my mind in

10   Ricky Clark's case; and that is, do I take a chance that this

11   person can ever be around children again?  And to me, the

12   answer is no.  Protection of the public is a statutory factor

13   that I have to consider.  If it weren't, the sentence weren't,

14   a lengthy sentence weren't otherwise justified by the nature

15   of this conduct.

16        So to me, the segregation of the Defendant after the

17   nature and circumstances of the crimes that we have discussed,

18   the lengthy period of time over which the crime occurred, the

19   betrayal of a position of trust of his son, and I am saying

20   all of that without even considering the repeat victimization

21   of the many victims that are included in Count XXI.  And I

22   don't take lightly that knowledge of this case, if it gets out

23   will make, encourage Defendants -- make it more difficult for

24   Defendants to plead when confronted with equal, equally

25   lengthy sentences.

47

1    But where the Defendant finds himself today in terms of

2  his age and his conduct is simply the starting point that we

3  have to deal with.  So I have looked at the case from the

4  standpoint, maybe not identical, but maybe somewhat similar to

5  Bostic in terms of the particular acts and the sentencing

6  range for some of the acts.

7    And I have been guided by the guidelines in the sense of

8  those that have more serious guideline ranges, I have imposed

9  in more serious sentences.  So while it is, perhaps, a more

10  complicated sentence than it needs to be, to me, it is

11  meaningful because of the nature and circumstances of the acts

12  that are depicted in the various counts for which the

13  guideline range was significant.

14    So with respect to Count I, which showed Minor Victim 1

15  being whipped, the Court is imposing the maximum sentence of

16  30 years.

17    With respect to Counts II through XII, the Court is

18  imposing a sentence of 20 years, not to in any way minimize

19  the conduct in those cases, but it is not as egregious as that

20  contained in Count I.

21    With respect to Count XIII, the Court is imposing a

22  sentence of 30 years.

23    With respect to Count XIV, the Court is imposing a

24  sentence of 30 years.

25    And with respect to Count XV, the Court is imposing a

1   sentence of 30 years to each of those counts; the first two,

2   one is anal rape, physical rape; one is penetration with a

3   bottle, and one involves blindfolding the victim.  I can only

4   imagine the fear that Victim 1 might have felt at that time.

5          Then with respect to Count XVII — wait a minute.  Is it

6   XVII or XVIII — sorry.  Yes, it is Count XVII.

7              MR. DeBROTA:  Your Honor, if I may, the Court

8   skipped Count XVI.

9              THE COURT:  Right.  Count XVI the Court is imposing

10  a sentence of 20 years.

11         With respect to Count XVII, the Court is imposing a

12  sentence of 30 years.

13         With respect to Counts XVIII and XIX, the Court is

14  imposing a sentence of 20 years.

15         And with respect to Count XX, which involves urination,

16  the Court is imposing a sentence of 30 years.

17         On Count XXI, because of the sheer volume of offenses or

18  the volume of materials, the acts contained within those

19  materials, the number of victims identified in this case, the

20  Court is imposing the statutory maximum of 20 years.

21         The Court is imposing that Counts I, XIII, XIV, XV,

22  XVIII, XX, and XXI would all be served consecutive to each

23  other for a total of 200 years.

24         On Counts II through XII, XVI, XVII, and XIX, the Court

25  is ordering those sentences concurrent to each other and Count

I.

   The Court is ordering the Defendant to forfeit his
interest in all personal property or other assets used in
connection with the offenses, including the computers,
computer storage media devices, phones, cameras, images and
videos seized from him on or about March 13, 2018.  The Court
is not ordering a fine or JVTA assessment based on the
Defendant's future ability to pay.

   The Court is ordering restitution, as I outlined before.
To Minor Victim 1, the Court is ordering, initially, the
amount of $3,730, and probation has prepared — I think it has
been circulated — a handwritten calculation that has to whom
these items will be paid.  We will incorporate that by
reference into the J&C.  He will have the opportunity,
pursuant to statute, to supplement should any additional
itemized costs be identified.

   With respect to Count XXI, the Court is ordering $3,000
each for victims ███ and ███, paid to Deborah Bianco in trust
for ███ and ███ at the address contained on the sheet
indicated by probation.  For the victim identified as ███,
$3,000 to Deborah Bianco in trust for ███.  For ███, $3,000
to be paid to Deborah Bianco in trust for ███.  To ███,
$3,000 in trust for ███ to Deborah Bianco.  ███, a
payment to Deborah Bianco in trust for ███.  For the five
victims of the 8 Kid Series, $3,000 each, payable to Tanya

Hankins in trust for the 8 Kid Series at the address provided
on the handout from probation.  Payment is to be made directly
to the clerk of the United States District Court for
proportionate distribution to the victims.

The Defendant shall notify the United States Attorney for
this district within 30 days of any change of mailing or
residence address that occurs while any portion of the
restitution remains unpaid.  Any unpaid restitution balance
shall be paid during the term of supervision at a rate of not
less than 10 percent of the Defendant's gross monthly income.
The Court finds the Defendant does not have the ability to pay
interest and waives the interest requirement.

The Defendant shall notify the probation officer of any
material change in economic circumstances that might affect
his ability to pay restitution.  If additional restitution
requests are received, the Court will notify the parties and
engage in the process of determining whether payment should be
made.

Supervised release is required by statute, and even
though the Court is aware that it is imposing an effective
life sentence, the Court will also impose a lifetime term of
supervised release on each of Counts I through XXI to be
served concurrently upon release of imprisonment based on the
nature of the offense and the need for supervision of the
Defendant, should he ever somehow be returned to the

1    community.  The Court is imposing those conditions of

2    supervision contained in Paragraphs 272 and 273 of the

3    presentence report for which the Defendant waived formal

4    reading.  They are incorporated by reference.

5         The Court is further ordering the Defendant to pay the

6    mandatory special assessment of $2,100.  The Court is not

7    ordering the JVTA assessment or a fine based on the

8    Defendant's future ability to pay and the restitution ordered.

9         Counsel, do you have any legal objection to the sentence

10   I have proposed or request any further elaboration of my

11   reasons under Section 3553(a) as to the length of imprisonment

12   or as to the length and/or conditions of supervised release,

13   Ms. Kupersmith?  Mr. DeBrota?

14             MR. DeBROTA:  Yes, just to clarify in making sure I

15   have, correctly, the consecutive versus concurrent aspect of

16   the sentence.  Is what the Court, essentially, done is to take

17   the sentences where you imposed 30 years and run those

18   consecutive to each other?

19             THE COURT:  Along with Count XXI.

20             MR. DeBROTA:  Yes.  So that would be there are six

21   of those.  So six times 30 is 180 plus 20 years for the

22   possession count is 200 years total?

23             THE COURT:  Correct.

24             MR. DeBROTA:  The effective total sentence is 200

25   years because the ones run — and then the 20-year ones are

1    run concurrent to all of that pack.

2              THE COURT:  To each other in Count I.

3              MR. DeBROTA:  That is what I thought, Your Honor.

4    Thank you, Your Honor.

5              THE COURT:  Thank you.

6         Ms. Beitz?  Mr. Dazey?

7              MR. DAZEY:  Ms. Beitz may have some question as to

8    the formulation of restitution.  I am not sure about that, but

9    I would say this.  Implicit in the manner in which the Court

10   pronounced sentence is the Court's recognition of the sort of

11   marginal deterrence-type argument made in the defense for what

12   is left over for the more serious offender.

13             THE COURT:  Right.

14             MR. DAZEY:  I might ask the Court to —

15             THE COURT:  I would address that; and that is, as I

16   said at the beginning, if I didn't address it specifically in,

17   in the implication, the implication of my comment about the

18   Defendant's life expectancy is the horrific nature of the

19   crimes he committed can't be erased by the fact that he has a

20   short life to live.  So I recognize that it may — I am not

21   sure how a 200-year sentence wouldn't deter other people, but

22   it may deter them from pleading guilty if they want to take a

23   shot at getting a lesser sentence.  But that is the extent to

24   which I will address that point.

25             MR. DAZEY:  This may be a small matter, but

1    considering the more immediate and significant loss and needs

2    of Minor Victim 1, ask the Court to consider that perhaps in

3    distribution sequentially of any restitution that could be

4    accomplished to first direct that restitution payment toward

5    Minor Victim 1; and thereafter, pro-rata towards the less

6    immediate, those victims less immediately impacted.

7            THE COURT:  Is there any objection to that for the

8    Government?

9            MR. DeBROTA:  I won't object to that for the moment,

10   Your Honor.  I think that is reasonable.  If we determine that

11   that is not legally permissible, they have to be treated the

12   same, we will let the Court know.  Also, it is often the case

13   that the victims, when they tell us how they want things

14   distributed, they probably would agree with that, in my

15   experience.  I think you can start from that proposition.

16           THE COURT:  Right.

17           MR. DeBROTA:  If there is no objection, why not?

18           THE COURT:  I think that that is a fair request, and

19   I appreciate it, Mr. Dazey.  I think that is an appropriate

20   thing to do because the harm to Minor Victim 1 in this case

21   was more immediate than the harms to the remaining victims,

22   not in any way minimizing their harms, but to suggest that the

23   harm to him was more immediate is a way of understatement in

24   this case.  So we will note, then, in the payment of

25   restitution, that payment shall go first to satisfy the

1   restitution obligation for Minor Victim 1.  And then after

2   that, it will be paid proportionately among the remaining

3   victims.

4       Ms. Beitz?

5           MS. BEITZ:  Nothing further, Your Honor.

6           THE COURT:  Thank you.

7       Is there any recommendation as to location?

8           MR. DAZEY:  Connecticut.

9           THE COURT:  The Court will recommend placement as

10  close to Connecticut as possible and programming for sex

11  offender treatment.  And with those additional recommendations

12  and the modification of the restitution order, the Court will

13  order the sentence imposed as stated.

14      Mr. Esposito, you can appeal your conviction if you

15  believe that your guilty plea was somehow unlawful or

16  involuntary or if there is some other fundamental problem in

17  the proceedings that was not waived by your guilty plea; do

18  you understand?

19          THE DEFENDANT:  Yes, ma'am.

20          THE COURT:  You also have a statutory right to

21  appeal your sentence under certain circumstances, particularly

22  if you think the sentence is contrary to law; do you

23  understand?

24          THE DEFENDANT:  Yes, ma'am.

25          THE COURT:  Generally any notice of appeal must be

1   filed within 14 days of the entry of judgment.  If you cannot

2   afford the filing fee or cannot afford to pay a lawyer to

3   appeal for you, the Court will appoint a lawyer to represent

4   you on appeal.

5       Also, upon request, the clerk of court can prepare and

6   file a notice of appeal.  Do you have any questions about your

7   appellate rights or the time limits for filing a notice of

8   appeal?

9           THE DEFENDANT:  No, ma'am.

10          THE COURT:  All right.  The Court will order the

11  Defendant remanded to the custody of the marshal.

12      Is there anything further for the Government?

13          MS. KUPERSMITH:  No, Your Honor.

14          THE COURT:  For the Defendant?

15      I am going to restate — the deputy clerk has some

16  concerns about the sentences.  So I am going to restate them

17  just so we are clear on what sentence goes with what count,

18  and I thought I was organized but apparently I am not.

19      The court ordered 30 years — I am clarifying for the

20  record to the extent I said anything different, it was just

21  due to multiple counts.  The Court's intention is for the

22  counts that carried with them the most significant guideline

23  ranges because they involved acts either involving sadistic

24  acts or other more violent acts, the Court is ordering 30-year

25  sentences on each of the following counts:  I, XIII, XIV, XV,

1  XVIII, and XX; and a 20-year sentence on Count XXI, which will

2  result in the total sentence of 200 years that the Court

3  discussed.

4       On each of Counts II through XII, XVI, and XVII and XIX,

5  the Court is ordering a sentence of 20 years.  If that is

6  different than what I said before, I — this is the sentence

7  the Court intended.  It is the sheer number of counts that may

8  have caused me to misspeak.

9            MR. DeBROTA:  Your Honor, if I could direct your

10 attention to the chart on page 7 of the PSR.

11           THE COURT:  Yes.

12           MR. DeBROTA:  Count XIX's description says, this

13 image is depicting Esposito digitally penetrating Minor

14 Victim 1's anus.  As compared to Count XVIII, this image

15 depicts him performing oral sex on the victim — and XVII has

16 various sex acts and then the holding up of the sign.  With

17 regard to which of those counts —

18           THE COURT:  XVIII is incorrect.  It should have been

19 XVII.

20           MR. DeBROTA:  Okay.  That is what I was —

21           THE COURT:  That is my mistake.

22           MR. DeBROTA:  So Count XVII is a 30-year count.

23           THE COURT:  Correct and Count XVIII is a 20-year

24 count.  I am sorry.

25           MR. DeBROTA:  We think you said that the first time,

1    Your Honor.

2            THE COURT:  All right.  Let me go back over that

3    again.

4        Counts I, XIII, XIV, XV, XVII, and XX, 30 years.  Counts

5    II through XII, XVI, XVIII, and XIX, 20 years each concurrent.

6        Then, it is the nature of the acts that prompted the

7    Court to impose, which prompted a higher guideline, which

8    prompted the Court to impose the maximum on the sentences I

9    just said.  I apologize for any confusion.

10           MR. DeBROTA:  That is all we have, Your Honor.

11           THE COURT:  Thank you.

12       Ms. Beitz?  Mr. Dazey?

13           MR. DAZEY:  No further comment or questions or

14   request for further explanation.

15           THE COURT:  All right.  Thank you very much.

16       The Defendant is remanded to custody of the marshal.

17           THE CLERK:  All rise.

18       (Concluded at 10:36 a.m.)

19                                   - - -

20

21

22

23

24

25

58

<u>CERTIFICATE OF COURT REPORTER</u>

1

2

3      I certify that the foregoing is a true and correct copy

4   of the transcript originally filed with the clerk of court on

5   February 24, 2020, and incorporating redactions of personal

6   identifiers requested by the following attorneys of record:

7   Steven D. DeBrota, in accordance with Rule 49.1 of the Federal

8   Rules of Criminal Procedure and Southern District of Indiana

9   Rule 80-2.

10      Redacted characters appear as a black box in the

11   transcript.

12

13

14   <u>S/s Jean A. Knepley</u>           <u>March 11, 2020</u>
     Signature of Approved Transcriber   Date

15

16

17

18

19

20

21

22

23

24

25